**In re ESTATE OF Solomon BROWN, Michelle D. Smith, Appellant.**

No. 06–PR–435.

District of Columbia Court of Appeals.

Argued June 26, 2007.
Decided Aug. 23, 2007.

Michelle D. Smith, pro se.

Nicholas D. Ward, Washington, DC, with whom Lorenzo Randle, was on the brief, for the objecting heirs.

Before FARRELL, REID, and THOMPSON, Associate Judges.

FARRELL, Associate Judge:

This appeal presents two questions. First, did the probate judge correctly find that appellant Michelle D. Smith had a conflict of interest when she simultaneously served as attorney to the personal representative of a decedent's estate and contracted with the latter to sell real property of the estate using Smith's services as sole owner of a real estate brokerage company? Second, having found a conflict of interest, did the judge have "equitable" authority to order the attorney to disgorge the realtor's commission she—or her company—had earned from the sale and return it to the estate? We answer the first question

"yes," the second "no." Although the judge had undeniable authority to consider any conflict of interest on Smith's part (a) in reviewing the personal representative's conduct in effecting the sale through her, and (b) in assessing the reasonableness of the attorney's fee request made on Smith's behalf, no statutory authority enabled the judge to reach past the personal representative, as it were, and order a third-party contractor, including an attorney, to disgorge funds based on a conflict of interest in performing duties owed solely to the personal representative.

I.

Solomon Brown died intestate leaving eleven heirs and one main estate asset, a townhouse on 15th Street, N.W. In 2003, one of his daughters, Auldrey Glover (Glover), was appointed unsupervised personal representative of the estate. Attorney Smith was retained by Glover to represent her in the estate administration. Smith was also a licensed real estate broker and sole owner of Smart Choice Real Estate, PLLC (Smart Choice).

Intending to sell the townhouse, Glover had received an October 2002 appraisal valuing the house at $258,000. In October 2003, Glover and Smith agreed in writing that Smart Choice would list and market the townhouse under an arrangement that would earn Smart Choice a (below-market) 3% commission in return for an exclusive listing, *i.e.*, the property would not be entered in the Multiple Listing Service (MLS). Less than two months later, the townhouse was sold to a couple, the Chens, for $300,000, Smith thereby earning a $9,000 sales commission. As it happened, the Chens again listed the property for sale in March 2004 for $599,000, and sold it a few days later for $730,000.

Glover, as personal representative, had not received consent to the sale of the property from the other heirs before the townhouse was sold. In May 2004, she filed a Petition to Court for Approval of the Sale of the Real Property, at the same time filing her First and Final Account of the estate. That same month, she filed the Personal Representative's Request for Compensation in the amount of $6,250 for herself and $9,692.72 for legal services performed by Smith. Thereafter, all but two heirs consented to the sale of the townhouse and did not object to the account or the request for compensation. In June 2004, however, a son and the estate of a daughter of the decedent filed objections in the Probate Division to the sale of the property, the accounting, and the request for compensation, alleging that the townhouse had been sold without their knowledge by Smith and for a price based on an appraisal more than one year old. The objections asked for a hearing, *inter alia,* "to find out why [Smith] did not disclose her connection to Smart Choice ... and why [Glover was seeking] to ratify a sales contract for a consideration far below the market and have the heirs ... pay her for this activity." In reply, Smith made the listing agreement part of the record and asserted both that Smart Choice was "a separate legal entity from Michelle D. Smith's legal practice" and that her "relationship with Smart Choice was disclosed to the personal representative and was indicated in the listing agreement."

The probate judge held a status hearing in September 2004 and identified the issues for trial as whether "the personal representative acted [reasonably in selling the townhouse for $300,000] considering the market conditions," and whether, "as to the sales commission, ... there was a conflict of interest" on Smith's part by virtue of the sale having been conducted through her real estate company. At a trial in late 2004 and early 2005, lengthy testimony was presented regarding the market value of the townhouse during the relevant time period, the main issue being whether—as the objectors argued—Glover had been negligent or even reckless in letting the property be sold for well below its actual value. But Smith also acknowledged that the judge was being asked to decide "whether there was a conflict of interest[,] with counsel for Ms. Glover being the owner of the company that did the real estate transactions." Although Glover was available to testify, Smith did not call her or anyone else as a witness regarding the circumstances of her listing agreement with Glover.

In February 2006, the judge issued an order finding that Glover had breached her duty as personal representative by not marketing the property in a prudent manner, including her use of a year-old appraisal and forgoing use of the multiple listing service. He ordered Glover to repay $75,000 to the estate, "the difference between the price she obtained for the property and the reasonable market value" shown by the appraisal testimony, "that is[,] $75,000." Glover took no appeal from that ruling.[1]

The judge further found that Smith's "behavior and action" as attorney to the personal representative was marked by a conflict of interest between her roles as attorney and realtor.

> Auldrey Glover used a broker ... [who] was her own lawyer.... The conflict of interest arises because if ... Glover had had an independent attorney she would have been told that the concession of commission to 3% [in the listing agreement] was of no benefit to the estate

---

1. We were informed at oral argument that she is since deceased.

unless the property was to be marketed properly.

The judge thus concluded that an "equitable sanction should ... be imposed against Ms. Smith," and ordered that "the commission of $9,000 to Ms. Smith's company shall be disgorged from her business" and returned to the estate by way of an offset against—a "reduc[tion in]"—the attorney's fees that otherwise "would be due to Ms. Smith." As an additional "sanction," the judge ruled that "the estate shall not be charged for [Glover's] fees and [those] of Ms. Smith regarding all time spent in this litigation."

## II.

■ We first consider whether the probate judge correctly found that Smith had a conflict of interest in simultaneously serving as attorney to the personal representative and contracting with her to sell the estate's townhouse through Smart Choice.[2] The judge was correct in this regard.

■ As relevant here, Rule 1.8(a) of the District of Columbia Rules of Professional Conduct (2007) prohibits a lawyer from "enter[ing] into a business transaction with a client" unless:

(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) The client gives informed consent in writing thereto.

There is no question that Smith, the sole owner of Smart Choice, entered into a business transaction with Glover by agreeing to market the townhouse through a listing agreement that would earn her a 3% commission upon sale. We need not dwell separately on whether the terms of the agreement—a reduced commission in return for an exclusive listing—were "fair and reasonable to the client," Rule 1.8(a)(1), because it is clear that Smith did not meet the other conditions of the rule.[3] At trial, Smith offered no testimony that she had given Glover, the personal representative, "a reasonable opportunity to seek the advice of independent counsel in the transaction," nor that Glover had "give[n] informed consent in writing thereto" beyond merely signing the listing agreement. As the probate judge recognized, listing the house for sale through Smart Choice was at least potentially disadvantageous to the estate, especially since the listing was an exclusive one that relinquished the potential benefits of an MLS listing. Yet the record is devoid of evidence that Smith (a) had told Glover that

2. The heirs challenge Smith's standing to bring an appeal from sanctions levied chiefly against her client, Glover. But Smith challenges only the order directing her—through Smart Choice—to disgorge the commission from the sale of the townhouse, and it is well settled that "[c]ounsel have standing to appeal from orders issued directly against them." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993); *see also, e.g., Employers Mut. Cas. Co. v. Keene Corp.*, 629 A.2d 581, 582 (D.C.1993) (proper appeal by attorney from Rule 11 sanc-

tions awarded against both defendant and its attorney).

3. Nevertheless, the interrelatedness of at least the first two conditions of Rule 1.8(a) is suggested by the Comment [4] to the Rule, stating that "[t]he fact that the client was independently represented in the transaction is relevant in determining whether the agreement was fair and reasonable to the client." (The Comments to the ethical rules "are intended as guides to interpretation," *see* paragraph [6] to the prefatory section entitled "Scope.")

she might want to consult independent counsel about whether to enter the listing transaction, or (b) had told her anything about the relative advantages and disadvantages of the listing to the estate, so that she could even gauge the utility of seeking independent counsel. In these circumstances, Glover's written signature on the listing agreement cannot constitute the "informed consent in writing" required by Rule 1.8(a)(3), for "[t]he client's signature on documents [evidencing the business transaction] cannot be considered 'written consent' under [the rule] where the client has not been informed of the implications ... of the transaction." *In re Taylor,* 741 N.E.2d 1239, 1242 n. 4 (Ind.2001).

Smith asserts that the absence of evidence regarding what, if anything, she had told Glover about these matters should not be laid to her account. To the extent this is a claim that she was not on adequate notice of the need to defend her conduct, the record does not support it. The objecting heirs raised the issue in written opposition both to the petition to ratify the sale of the house and to Glover's claim for attorney's fees on Smith's behalf, and at the status hearing the judge made clear that one trial issue would be whether a conflict of interest on Smith's part tainted the sale by the personal representative. Smith herself acknowledged at the trial that an issue to be decided was whether she had a conflict of interest in "being the owner of the company that did the real estate transactions." She cannot claim ignorance of her obligations as a lawyer under Rule 1.8(a), nor of the fact that the trial was being held, among other things, to afford her the opportunity to demonstrate that she had no conflict of interest.

Smith relatedly argues that the probate judge heard no "testimony from Ms. Glover or [c]ounsel as to what [c]ounsel advised Ms. Glover" (Reply Br. for Smith at 3). As will be apparent, however, the burden was on Smith to demonstrate compliance with the ethical rule, and Smith offered no reason to the judge—lawyer-client confidentiality or any other—why she could not have shown the substance of her advice to Glover about the listing agreement. As it turned out, testimony by Glover was barely relevant to the defense Smith offered to the conflict alleged: in summation she argued that, because in the *sale of the property* to the Chens she had been broker or listing agent only for the seller, "her ... duty of loyalty [remained always] to" Glover and the estate ("I have the same duty towards her and the estate"), and so "there [was] no conflict of interest." But this ignored the listing agreement, which left the marketing of the townhouse solely to the efforts of Smith and her company with possible disadvantage to the estate, a matter on which Glover was entitled to a reasonable opportunity to seek independent advice.

■ Rule 1.8(a) states a prohibition ("[a] lawyer·shall not") with an exception ("unless"), and thus by clear implication imposes on the attorney the burden to show that a business transaction he or she entered into with a client entailed no conflict of interest. Interpreting a similarly worded provision, the Supreme Court of Washington has said:

> The burden of proving compliance with [Rule] 1.8 rests with the lawyer; an attorney-client transaction is prima facie fraudulent. A lawyer must prove strict compliance with the safeguards of [Rule] 1.8(a)[, ... and t]he opportunity to seek independent advice must be real and meaningful.

*Valley/50th Avenue, L.L.C. v. Stewart,* 159 Wash.2d 736, 153 P.3d 186, 190 (2007) (citations and internal quotation marks omitted). The RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 126 (2000), set-

ting forth a similar bar to business transactions between a lawyer and client unless conditions corresponding to those in Rule 1.8(a) are satisfied, likewise states, in Comment a, that "[i]n any civil proceeding between a lawyer and a client or their successors, the lawyer has the burden of persuading the tribunal that requirements stated in this Section have been satisfied."[4] Construing its own parallel ethical rule, the California Supreme Court too has recognized that "[w]hen an attorney-client transaction is involved, the attorney bears the burden of showing that the dealings between the parties were fair and reasonable and were fully known and understood by the client." *Hunniecutt v. State Bar*, 44 Cal.3d 362, 243 Cal.Rptr. 699, 748 P.2d 1161, 1167 (1988). Finally, the predecessor to Rule 1.8(a), DR 5–104(A), carried with it this Comment in the American Bar Foundation's Annotated Code of Professional Responsibility (1979), at 205 (emphasis added):

> DR 5–104(A) is essentially a restatement of the common law rule that creates a presumption of invalidity concerning business transactions between attorney and client. This presumption is based upon the attorney's fiduciary status, which dictates that the attorney maintain the highest degree of fairness and good faith and obligates the attorney *to come forward with convincing evidence that full disclosure was made to the client about the nature of the transaction and its effects on the client's interests.*

Our dissenting colleague does not dispute this placement of the burden of proof generally, but thinks that it should not apply here when it is not the client (Glover) who is alleging an ethical violation but a third party, *i.e.*, heirs to the estate. Smith goes even further and asserts, without citing authority, that "the only party able to invoke Rule 1.8 against . . . Smith is . . . Glover because she is the [c]lient" (Reply Br. for App. at 4). Neither point persuades us. The objecting heirs were not just any "third party." They were persons whose interests Glover was charged with protecting, and when in their view she failed to do so—in part by ignoring a conflict of interest on her attorney's part adversely affecting the sale of the townhouse—they stepped into her shoes, as it were, and asserted the conflict as reason to invalidate the sale. And, too, they raised the conflict in opposing Smith's request, sponsored by Glover, to be compensated by the estate for sale-related services they believed were tainted by Smith's divided interests. We do not see why, in such circumstances, the heirs should have been required to shoulder a burden of proof Glover would have been spared had she herself recognized the conflict and questioned Smith's actions—all the more so since Smith, not the heirs, was best equipped to show the circumstances surrounding the transaction with Glover.

In sum, then, a business transaction between an attorney and client generally is so fraught with the potential for a conflict of interest[5] that, once the transaction has been shown, the burden falls to

---

**4.** Even in a disciplinary case, the Restatement observes, "once proof has been introduced that the lawyer entered into a business transaction with a client, the burden of persuasion is on the lawyer to show that the transaction was fair and reasonable and that the client was adequately informed." RESTATEMENT § 126, cmt. a.

**5.** *See State Bar v. Dolenz*, 3 S.W.3d 260, 265 (Tex.App.1999) ("Business relationships between lawyers and clients are beset with *conflicts of interest and will often involve* situations in which the lawyer occupies a dangerously superior bargaining position.").

the attorney to justify it in the multi-conditioned way Rule 1.8(a) prescribes. Whether the listing agreement between Smith and the personal representative was presumptively "fraudulent," *Valley/50th Avenue, supra,* or merely such as to require her to prove compliance with each condition of Rule 1.8(a), the probate judge correctly found that she had not met that burden and that the sale of the townhouse through Smart Choice was tainted by a conflict of interest. *Cf. also* D.C. Bar Op. No. 226 (1992) (lawyer acting as attorney and real estate broker "with respect to a single transaction" should comply "with applicable ... Rules of Professional Conduct [including Rule 1.8(a)] regardless of which 'hat' he is wearing in particular aspects of that transaction").

## III.

■ The probate judge erred, however, in the remedy he exacted from Smith (and/or Smart Choice) for the conflict of interest. As explained, the objecting heirs cited the conflict in their twofold request that the judge (a) invalidate the sale of the townhouse (at a below-market price) as a breach of fiduciary duty by the personal representative, and (b) reduce the attorney's fees claimed by Smith as counsel to Glover. The judge did not invalidate the sale; rather, as pointed out, he ordered Glover to repay to the estate $75,000, the difference he found between the sale price and a price that would have reflected "reasonable market value." The correctness of that ruling is not before us. Nor did the judge reject or reduce the attorney's fees requested on Smith's behalf, except by the (modest) portion of the fees representing her "time spent in this litigation." The judge, in other words, did not reach the question of the "reasonableness" of the requested fees under D.C.Code § 20–753 (2001). Instead, the judge dealt with Smith's conflict of interest by what he

termed the "equitable sanction" of making her "disgorge" the $9,000 commission paid to Smart Choice for its services; that money was to be repaid to the estate through an offset to the attorney's fees otherwise due Smith—thus making assessment of the reasonableness of the fees unnecessary.

■ We find no statutory authority for the judge to order the remedy he did. Undeniably the judge had authority to decide the heirs' claims of breach of fiduciary duty by the personal representative, *see* D.C.Code § 20–743, for having let the estate's main asset be sold through a listing agreement tainted by a conflict of interest. But Smith, as attorney to the personal representative—*i.e.,* "an employee of the personal representative," *Poe v. Noble,* 525 A.2d 190, 193 (D.C.1987)—owed no fiduciary duty to the estate, and the fact merely that (in the judge's words) her conflicting interests "harmed [the estate]" did not permit the judge to order her, or Smart Choice, to disgorge a real estate commission in what amounted to damages payable to the estate. The situation is no different, we think, than if Glover had hired a home improvement contractor to renovate the townhouse and the contractor had breached the agreement or performed negligently; no one would fairly argue that the probate court, exercising its authority over the personal representative, could order the contractor to pay damages or make restitution to the estate for its negligence. Indeed, as a matter of personal jurisdiction, the third-party contractor might not even be before the court. Enforcement of the contract, instead, would rest there—and rests here—with the personal representative, who in turn is accountable to the court for any failure in his stewardship of the estate. But reaching past the personal representative and ordering restitution directly by a contractor, including an attorney, as the judge did

here, is not within the otherwise broad statutory authority possessed by the probate court.

Our decision in *Hopkins v. Akins,* 637 A.2d 424 (D.C.1993), supports that conclusion. There the spouse of an intestate decedent sued the lawyer for the personal representative for breach of contract and legal malpractice, alleging that the lawyer had allowed another heir to divert estate assets and thereby breached a duty owed not just to the personal representative but to the estate beneficiaries. The trial judge agreed that the lawyer's duty of care extended to the heirs, and after a bench trial entered judgment against the lawyer in the amount of the spouse's lost share of the estate. This court reversed, joining "the broad majority of the courts" that had barred suits by a beneficiary against an attorney of the personal representative for negligence. *Id.* at 428. The reason was essentially one of privity and the bedrock rule "'that the obligation of the attorney is to his client, and not to a third party,'" *id.,* quoting *Needham v. Hamilton,* 459 A.2d 1060, 1061 (D.C.1983):

> When an attorney is employed to render services in ... settling the estate, he acts as attorney of the executor, and not the estate, and for his services the executor is personally responsible.

*Id.,* quoting RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE, § 26.4, at 600 (3d ed. 1989) (citation omitted); *see also id.,* quoting *Goldberg v. Frye,* 217 Cal.App.3d 1258, 266 Cal.Rptr. 483, 489–90 (1990) ("The beneficiaries are entitled to even-handed and fair administration by the fiduciary. They are not owed a duty directly by the fiduciary's attorney.").[6]

In this case, of course, the objecting heirs did not sue Smith—indeed, they sought no relief against her directly, though challenging the attorney's fees requested on her behalf by the personal representative. The judge nevertheless awarded what in effect were damages to the estate for breach of a duty that, under *Hopkins,* Smith did not owe the beneficiaries. If her sale of the townhouse in contravention of Rule 1.8(a) resulted in harm to the estate, the remedy for that was an action by Glover against Smith or her company, or, failing that, an action by the heirs against Glover for maladministration of the estate. But neither "equity" nor any similar authority cited by us—or that we can find—allowed the judge to bypass the personal representative and enforce a duty of unconflicted representation that Smith owed to her and not the beneficiaries.

■ Accordingly, the case must be remanded to the probate judge with directions to vacate the order of disgorgement. At the same time, Smith's conflict of interest remains a relevant consideration for the judge in connection with the attorney's fee request made by the personal representative—a request the judge largely put aside by using the fee-request as a setoff against the commission he had ordered disgorged. To the extent the judge finds that particular services billed by Smith were affected by her conflict of interest, the judge may take that into account in assessing the reasonableness of the fees requested. *See* D.C.Code § 20–753.

*Reversed and remanded for further proceedings consistent with this opinion.*

---

6. The court left open whether *intentional* wrongdoing by the attorney could rise to liability directly to the estate. *See Hopkins,* 637 A.2d at 430. In the present case, no claim is made that Smith engaged in intentional wrongdoing of any sort; her conflict of interest at most amounted to *per se* negligence in performing the duties she owed to the personal representative.

Concurring opinion by Associate Judge REID.

Dissenting opinion by Associate Judge THOMPSON.

REID, Associate Judge, concurring:

I fully agree with Judge Farrell's opinion for the court. While I respect Judge Thompson's dissent, I cannot agree with her view that "the result the majority reaches today is unfair to [Ms.] Smith." Beginning on June 8, 2004, when Mr. Homer Brown filed pleadings opposing the sale of the property in question and objecting to the Personal Representative's request for compensation for Ms. Smith, she clearly was on notice of her alleged conflict of interest due to her representation of the Personal Representative and her role as sole owner of the company responsible for the real estate transaction. In addition, during the first day of a five-day hearing (which occurred on September 24, 2004, October 27, 2004, February 2, 2005, February 7, 2005, and February 8, 2005), the trial court clearly stated, "there is an objection for the commission of the sale of real estate alleging conflict of interest in that the real estate company that was involved in the sale of the real estate is alleged to have been owned by the attorney for the estate." Later on September 24, 2004, the trial judge stated: "So the next issue ... that we will be dealing with is the question raised as to the sales commission, the allegation being that there was a conflict of interest.... So we will have to address that as well." Ms. Smith did not object to the trial court's statements and, in fact, said nothing about the conflict of interest allegation on September 24, 2004.

Nor did Ms. Smith raise any question about the conflict of interest issue on the second or third or fourth day of the hearing, which focused on testimony by experts and "whether the personal representative acted in the best interest of the estate by proceeding to sell the property based on an appraisal that was approximately a year old." On the fifth day of the hearing, February 8, 2005, Ms. Smith moved into evidence, without objection, the real estate contract for the transaction in question. Also, without objection, Mr. Brown's attorney moved into evidence the listing agreement for the property. After Mr. Brown's attorney called as a witness the daughter-in-law of the deceased, Ms. Smith inquired as to the nature of her testimony. In doing so, she summarized the two issues before the court stating, in part, that "the second issue was whether there was a conflict of interest with counsel for Ms. Glover being the owner of the company that did the real estate transaction[ ]." Thus, Ms. Smith recognized that the conflict of interest issue was before the trial court. And, her strategy for addressing that issue became quite clear as she proceeded through her closing argument. After discussing the question of the appraisal, Ms. Smith declared: "With regard to the issue of whether there was a conflict of interest in counsel [for the Personal Representative] being the broker for [the Personal Representative's sale of the property], I would like to refer the Court to some definitions of who a real estate agent represents and I have a form for you." Other counsel objected to Ms. Smith's effort to introduce any document not admitted into evidence prior to closing. The trial court sustained the objection but nevertheless permitted Ms. Smith to make her argument regarding the alleged conflict of interest. She asserted, in part:

In the contract that has already be[en] submitted ..., there is an acknowledgment by Agent Michael Lancaster that he represents the seller.

Therefore, if the agent represents the seller, the broker stays on the same

agency as the listing agent and therefore counsel in the role of a broker has the same role to Ms. Glover as the personal representative of the estate acting as a broker.

So, there is no conflict of interest because as counsel, I have the same duty towards her and the estate. So, there's no conflict of interest.

In short, the record shows that Ms. Smith not only was on repeated notice that her alleged conflict of interest was at issue, but also that she understood the issue, laid the foundation for her closing argument by introducing the real estate contract during the presentation of evidence, and then proceeded to contend in closing argument that no such conflict existed. In doing so, she completely ignored Rule 1.8(a) of the Rules of Professional Conduct, as well as her burden, which Judge Farrell discusses in the opinion for the court. She also overlooked the role of the Personal Representative of Mr. Brown's estate. As we previously have reiterated: "Personal representatives act in a fiduciary role to administer decedent's estates." *In re Uchendu*, 812 A.2d 933, 937 (D.C.2002) (citation omitted). " 'A personal representative owes a fiduciary duty to the estate and its beneficiaries.' " *In re Estate of Leroy Green*, 912 A.2d 1198, 1209 (D.C. 2006) (quoting *In re Estate of Hines*, 715 A.2d 116, 119 (D.C.1998)). "An important aspect of a personal representative's fiduciary duty is that [she] must place the best interests of the heirs ahead of [her] own interests." *Id.* (citing *Richardson v. Green*, 528 A.2d 429, 436 (D.C.1987)).

Finally, I believe it is important to recognize that the hearing before the trial court was not equivalent to a bar disciplinary proceeding where Bar Counsel places formal charges against and prosecutes an attorney during a formal evidentiary process. Rather, here the trial court was faced with an allegation made by one of the heirs against Ms. Smith in her role both as counsel to the Personal Representative and as owner of the company responsible for the sale of the decedent's property, and a concomitant objection to the real estate sale and the request for compensation. The trial judge made certain that Ms. Smith understood that the alleged conflict was at issue, admitted into evidence the real estate contract at Ms. Smith's request, admitted the listing agreement at the request of Mr. Brown, and even allowed Ms. Smith to discuss her defense to the conflict of interest charge during closing argument. Under the peculiar circumstances of this case, I discern no unfairness to Ms. Smith.

THOMPSON, Associate Judge, dissenting:

In my opinion, the result the majority reaches today is unfair to Smith. I cannot join my colleagues in upholding the trial court's finding that she violated Rule 1.8(a) of the Rules of Professional Conduct when Glover's siblings, who had the burden of proof in this proceeding before Judge Lopez, presented no pertinent evidence other than the fact of a business transaction between lawyer/real estate broker Smith and her client Glover; when neither the Probate Division's procedural rules nor the court's instructions required Smith to make an affirmative showing with respect to matters as to which the siblings had the burden of proof; where, before the trial court's ruling, Rule 1.8(a) and its requirements were never mentioned in this litigation; and where this court has not interpreted the requirements of Rule 1.8(a) in the context of a straightforward real property listing agreement using a standard form.

A brief recap of the facts: The siblings objected to personal representative Glo-

ver's request to ratify the sale of the house (the estate asset), alleging that Smith did not disclose her interest in Smart Choice, the real estate brokerage company with which Glover contracted to list the property for sale. It appears that this allegation was incorrect, as Smith signed the listing agreement. Judge Lopez scheduled an evidentiary hearing and advised the parties that the issues on which he would hear evidence were whether the selling price was reasonable and whether Smith had a conflict of interest.[1] Judge Lopez confirmed to the parties that the siblings had the burden of proof in the proceeding. All parties advised the court about the witnesses they expected to call, Smith saying that she anticipated calling Glover but explaining that whether she would do so depended on what evidence was presented by the siblings.[2] The siblings put on expert and lay testimony about the reasonableness of the sale price, but presented no evidence on conflict of interest.

More particularly, none of the witnesses mentioned Rule 1.8(a) or testified about its requirements or whether they were satisfied. No witness testified that the terms of the listing agreement—a Greater Capital Area Association of REALTORS, Inc. "Exclusive Right to Sell–Listing for Improved Real Property" agreement specifying a six-month exclusive right to sell and a 3% broker's fee—were unfair or unreasonable. There was no evidence that Smith denied Glover the opportunity to consult with independent counsel. There was no evidence that Glover did not under-stand the (uncomplicated) terms that were set out expressly in the listing agreement that she signed, or did not understand that Smith had an interest in the real estate brokerage company. The listing agreement states, as the only "Additional Term[ ]," that "Seller does not want agent to enter listing on MLS." There was no evidence that this approach was suggested to Glover or foisted upon her by Smith. There was no evidence that Glover—who, the record discloses, was a GS–11 personnel management specialist—was incompetent. There was no evidence that Glover was dissatisfied with Smith's services.

At the close of the siblings' evidence, the court asked Smith whether she had "rebuttal evidence." Not surprisingly, she said she did not (there being no evidence on conflict of interest to rebut, and Glover having already put on her expert testimony out of turn). The court then heard the parties' closing arguments. Counsel for the siblings characterized Glover as having been "hell bent" on selling the property her way and insistent on selling the property without a multiple listing because she was indifferent to their interests.[3] Smith argued that her interests as broker were aligned with those of Glover as seller, not with the buyer. On this record, the court found that Smith violated Rule 1.8(a).

My colleagues in the majority justify this result on the basis of the principle that the lawyer bears the burden of proving compliance with Rule 1.8(a). However, as far as I can tell, that principle pertains to assignment of the burden *as between law-*

---

1. As Smith reiterated the court's instructions, "[t]hose are the two issues that the Court instructed us to limit our testimony."

2. At one point in the proceedings, Smith inquired as to whether she might call Glover out of turn to present her testimony, explaining that it might be difficult for Glover to take off from work to be present in court at a later date. The court responded, "I am not so sure you want to do that because they [the siblings] have the burden of proof, and you'll want to hear what they have to say before you want to put on your evidence."

3. The record suggests that Glover wanted to sell the property quickly to relieve herself of the obligation to pay real estate taxes.

*yer and client. See, e.g., Valley/50th Ave., L.L.C. v. Stewart,* 159 Wash.2d 736, 153 P.3d 186, 190 (2007). Comment (a) to section 126 of the Restatement (Third) of the Law Governing Lawyers, cited by the majority, states that "[i]n any civil proceeding *between a lawyer and a client* or their successors, the lawyer has the burden of persuading the tribunal that requirements stated in this Section have been satisfied." *Id.* (emphasis added). The principle assigning the lawyer the burden of proof also has some application in disciplinary proceedings in cases, where the client alleges that her attorney has acted in a way inconsistent with the rules governing professional conduct, *see, e.g., Hunniecutt v. State Bar,* 44 Cal.3d 362, 243 Cal.Rptr. 699, 748 P.2d 1161, 1167 (1988); and, more generally, where the lawyer has an affirmative duty (but not the sole burden) to come forward with evidence bearing on her compliance with the Rules in question. *See* D.C. RULES OF PROF'L CONDUCT R. 8.1(b) ("[A] lawyer in connection with a ... disciplinary matter, shall not ... fail to disclose a fact necessary to correct a misapprehension known by the lawyer ... to have arisen in the matter, or knowingly fail to respond reasonably to a lawful demand for information from an admissions or disciplinary authority ... .").

Even in disciplinary cases, however, Bar Counsel has the burden of proving a violation of the Rules of Professional Conduct by clear and convincing evidence, *see In re Cater,* 887 A.2d 1, 13 (D.C.2005), and a respondent is not required to "make Bar Counsel's case." *In re Artis,* 883 A.2d 85, 99 (D.C.2005). This court has upheld Board on Professional Responsibility/Hearing Committee recommendations that charges be dropped where Bar Counsel presented no evidence to sustain the charge that a lawyer violated a rule of professional conduct. *See In re Douglass,*

859 A.2d 1069, 1072–73, 1085 (D.C.2004) (sustaining "the Board's determination that no violation of Rule 1.8(g)(2) has been established under the applicable standard of proof" because "Bar Counsel was unable to prove that Mr. Walker did not represent Mrs. Wilson at the crucial time"); *cf. In re Lawrence,* 954 So.2d 113, 118 (La.2007) (upholding hearing committee finding that no violation of Rule 1.8(a) was proven where no evidence was introduced to establish that client was denied the opportunity to seek the advice of another attorney before she signed the agreement with respondent and client did not deny understanding the terms of the agreement). As far as I have been able to determine, the principle that the lawyer bears the burden of proving compliance with the rules of professional conduct has not heretofore been applied in a case such as this, where it is a third party, not the client, that alleges a violation and that third party fails utterly to present any evidence on the issue. In cases such as this, I do not believe that this principle displaces the familiar rule, applicable in probate proceedings as well as others, that it is the moving party (here, the siblings) that bears the burden of proof.

We would have a different case if Rule 1.8(a) flatly prohibited business transactions between lawyer and client, or prohibited a lawyer from acting as both attorney and real estate broker. But the plain language of the rule does not establish any such broad prohibition, nothing in our decisions suggests such a broad prohibition, and it appears from our decision in *In re Pierson,* 690 A.2d 941 (D.C.1997), that the Bar community does not understand the Rule 1.8(a) to impose such a prohibition. *See id.* at 944 (referring to a hearing committee finding that "the facts ... did not establish a violation of Rule 1.8(a) ... [because] not every transaction with a

client requires separate counsel or the client's written consent"). I am aware of only one case from another jurisdiction holding that a lawyer may not act as both lawyer and real estate broker for a client. *See In re Estate of Schuldt,* 428 N.W.2d 251, 259 (S.D.1988) ("There is a need to limit the attorney's role to that of an attorney in probate proceedings. An attorney should be an attorney first and foremost, not broker or executor or whatever hat he can find to wear."). Even in that case, the court stated that it would give this prohibition only future effect. *See id.* at 258 ("We note for the future that it is doubtful whether this arrangement would pass muster against Rule 1.8(a) . . . .").

As the majority notes, District of Columbia Bar Ethics Opinion No. 226 states that where a lawyer "is performing both professional roles (lawyer and [real estate] broker) with respect to a single transaction, . . . he should comply with applicable provisions of the Rules of Professional Conduct. . . ." However, this court has never interpreted Rule 1.8(a) in a context such as the one presented here, involving a straightforward real estate transaction and a standard form listing agreement. Without exception, the cases in which we have interpreted Rule 1.8(a) or found violations of the Rule have involved a business transaction—most typically, a loan from the client to the lawyer—that manifestly was solely for the advantage or convenience of the lawyer (and of no apparent benefit to the client, and, in many cases, entailing a non-standard instrument prepared by the lawyer) and/or a transaction with an elderly, incompetent or otherwise vulnerable client. *See In re Elgin,* 918 A.2d 362, 375 (D.C.2007) (lawyer used client's credit card and thereafter settled a collection suit by the credit card company against the client "on terms which he negotiated and apparently did not disclose to [the client] in violation of . . . [Rule 1.8(a)] requiring that

the [client] be 'given a reasonable opportunity to seek the advice of independent counsel in the transaction' "); *In re Bailey,* 883 A.2d 106, 111, 111 n. 12, 113 (D.C.2005) (lawyer borrowed proceeds of client's personal injury settlement suit and violated Rule 1.8(a) by failing to advise client, who "had difficulty fully comprehending spoken English," to seek the advice of independent counsel to review promissory note prepared by lawyer; no finding that the transaction was unfair or unreasonable to the client even though lawyer did not provide client with the prevailing interest rate).

*See also In re Douglass,* 859 A.2d at 1081–82 (lawyer violated Rule 1.8(a) where, after client indicated her intent to discharge lawyer, lawyer "informed her that she would have to sign a note confessing judgment to [the lawyer] in the amount of $750 for his legal services, as well as a release shielding him from [malpractice liability]" and "did not advise [her] to seek the advice of another attorney about the confession note and the release, and also did not fully disclose the terms of either of those documents. . . . For example, [the lawyer] did not inform [client] of his hourly rate, the amount of actual hours he had expended on [her] matter, or the basis for the $750 quantum meruit calculation for the confession note. Nor did [the lawyer] explain technical legal terms in the documents"); *In re Austin,* 858 A.2d 969, 972–73 (D.C.2004) (lawyer violated Rule 1.8(a) where he sought and received a number of personal loans totaling over $26,000 from his 73–year–old client even though he "was aware of [her] limited financial resources and lack of sophistication" and did not advise her to seek the advice of independent counsel); *In re Maxwell,* 798 A.2d 525 (D.C.2002) (reciprocal matter involving the facts of *Maxwell v. Gallagher,* 709 A.2d 100, 102 (D.C.1998), which describes

the lawyer's actions in acquiring stock in a client's corporation as "double dealing" and "failing to disclose the business advantages they sought"); *In re Viehe,* 762 A.2d 542, 543 (D.C.2000) (lawyer violated Rule 1.8(a) where, using checks that clients had signed, for use in completing a real estate transaction, without writing in a payee or amount, lawyer wrote himself checks totaling $77,500, without making the necessary disclosures or obtaining the clients' written consent); *In re Jones–Terrell,* 712 A.2d 496, 498–99 (D.C.1998) (lawyer violated Rule 1.8(a) by engaging in a transaction with a client without full disclosure or fair and reasonable terms where she caused elderly client, who was found to be incapable of making "rational decisions about her finances or her health," to sign an agreement specifying that lawyer and her husband would move in with client rent-free, for one year); *In re McLain,* 671 A.2d 951, 953 (D.C.1996) (finding that lawyer violated Rule 1.8(a) where he borrowed $21,500 from clients to help satisfy his income tax obligations and gave them a promissory note which he never explained and did not recommend that another lawyer review the note, and where he asked the same clients for a loan to purchase a house and clients agreed to buy the house and to let lawyer live in the house in exchange for monthly payments equal to the mortgage plus expenses and taxes); and *In re White,* 605 A.2d 47, 48 (D.C.1992) (reciprocal discipline matter in which lawyer was sanctioned for violating Rule 1.8(a) where he induced 88–year–old client to "loan" him over $160,000).

In some of the foregoing cases involving business transactions with vulnerable clients and/or for the sole advantage of the lawyer, we sustained a finding that the respondent lawyer had violated Rule 1.8(a) by failing to advise the client to seek the advice of independent counsel. But we have never held that Rule 1.8(a) invariably requires such affirmative advice rather than, in the language of the rule, "a reasonable opportunity to seek the advice of independent counsel in the transaction." [4] (I note that, by contrast, Rule 1.8(g)(2) prohibits a lawyer from making an agreement prospectively limiting the lawyer's liability to a client for malpractice "without first advising that person in writing that independent representation is appropriate in connection therewith.") A number of states have adopted the language of ABA Model Rule 1.8(a) that does require such affirmative advice.[5] *See, e.g., Attorney*

---

4. Moreover, the comments to Rule 1.8(a) state not that a review by independent counsel on behalf of the client is always necessary, but instead that such a review is "often advisable."

5. Model Rule 1.8(a) states:
    (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
    (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
    (2) the client is advised in writing of the desirability of seeking and is given a rea-

sonable opportunity to seek the advice of independent legal counsel on the transaction; and
    (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.
MODEL RULES OF PROF'L CONDUCT R. 1.8.
    I note that courts in states that have adopted this model language have not always strictly enforced the affirmative-advice-in-writing requirement. *See, e.g., Milo Fields Trust v. Britz,* 378 N.J.Super. 137, 874 A.2d 1130, 1138 (App.Div.2005) (holding, despite New Jersey rule prescribing that client be advised in writing of the desirability of seeking independent legal advice about a pro-

*Grievance Comm'n v. Parker*, 389 Md. 142, 884 A.2d 104, 111 n. 3 (2005) ("In the revised [Maryland Rules of Professional Conduct] that we adopted effective July 1, 2005, Rule 1.8(a)(2) specifies that the client be advised in writing of the desirability of seeking the advice of 'independent legal counsel.'" (internal emphasis omitted)). Our jurisdiction has not done so, and I see no reason why we should uphold the finding here that Smith violated Rule 1.8(a) on the basis of a failure to prove that she advised Glover to seek independent counsel where our rule does not explicitly require this, and where the terms of the transaction do not on their face appear to have been unfair to either party (a six-month exclusive right to sell in exchange for a discounted commission, terms that, it would seem, left both seller and broker with an incentive to sell the property for the highest possible price). In my view, the transaction here raises no more red flags than "a contingent fee agreement with a client in a civil case," which the comments to Rule 1.8(a) states are not precluded by the Rule so long as the contingent fee agreement complies with Rule 1.5(c) (requiring a written agreement stating how the fee is to be calculated).[6]

Courts in some other jurisdictions have found violations of Rule 1.8(a) where a lawyer acted as both real estate broker and lawyer to a vulnerable client or pursu-

ant to an unusual listing agreement that was to the obvious and lopsided advantage of the lawyer. *See In re Moores*, 854 N.E.2d 350, 352–53 (Ind.2006) (lawyer who was also a real estate broker violated Rule 1.8(a) where he requested a legal retainer that the clients could not pay in full, and so to protect himself, lawyer had the clients sign, without the benefit of independent legal counsel, an eight-year exclusive listing agreement that was on terms unfavorable to the clients and that included language that the lawyer acknowledged was unusual, giving him the right of refusal on the sale of the property); *In re Lupo*, 447 Mass. 345, 851 N.E.2d 404, 407–08, 411 (2006) (violation of Rule 1.8(a) where, among other things, lawyer-real estate broker had elderly clients sign a standard form listing agreement with some of the information, including his fee, not yet specified, and did not advise the clients that they should seek independent counsel). However, other than *In re Estate of Schuldt*, 428 N.W.2d 251, discussed *supra*, where the court stated that it would give only prospective effect to its holding that lawyers should not simultaneously act as lawyers and real estate brokers, I am aware of no case in which a court found a violation of Rule 1.8(a) solely from the fact of a lawyer's acting as real estate broker for the client, or solely because it was not

posed business transaction between lawyer and client, that "it is not mandatory that an attorney advise his client in writing to seek independent counsel"); *Twachtman v. Hastings*, No. CV 9557307S, 1997 WL 433878, \*8, \*11, 1997 Conn.Super. Lexis 2014, \*21, \*30 (Conn.Super.Ct.1997) (holding, despite Connecticut rule requiring that the "client or former client [be] advised in writing that the client or former client should consider seeking the advice of independent counsel in the transaction," that "there is no indispensable requirement that the client actually receive [independent legal advice] from another attor-

ney or that he be instructed by his attorney that such an alternative is available to him").

6. I note that, like the broker's fee here, a contingent fee arrangement affords the lawyer an incentive to resolve the matter for the highest possible amount of money, but does not guarantee against the lawyer's efforts to achieve a quick but less lucrative settlement. Lawyers' hourly fee arrangements with their clients also may provide incentive for lawyers to run up a high number of billable hours, but our rules and case law do not suggest that such fee agreements must be reviewed by independent counsel.

shown that the lawyer advised the client to seek independent legal counsel.[7]

Nor am I aware of a case in which a court found a violation of Rule 1.8(a) solely from the fact that the lawyer did not prove that she explained the ways in which client's and the lawyer/real estate broker's interests might not be identical. Our prior disciplinary rules may have contained such a requirement. In our jurisdiction, Rule 1.8(a) replaced former Disciplinary Rule 5–104(A) as of January 1, 1991. *See In re McLain*, 671 A.2d at 952 n. 1. The language of Rule 5–104(A) was different: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." As we explained in *In re James*, 452 A.2d 163, 167 (D.C.1982), that " '[f]ull disclosure' includes a clear explanation of the *differing* interests involved in the transaction and the advantages of seeking independent legal advice. It also requires a detailed explanation of the risks and disadvantages to the client entailed in the agreement, including any liabilities that will or may foreseeably accrue to him." The "consent after full disclosure" language used in former Rule 5–104(A) is missing from Rule 1.8(a)(3) ("the client consents in writing thereto"), and I do not believe that we can fairly read any other portion of Rule 1.8(a) to impose an identical requirement. We have said that Rule 1.8(a) is "similar" to Rule 5–104(A), *see In re McLain*, 671 A.2d at 952 n. 1, but we have not said that the two rules are to be construed as identical. As noted, Rule

5–104(A) required "client consent [ ] after full disclosure," and "full disclosure" entailed, *inter alia*, an explanation of the advantages of seeking independent legal counsel. By contrast, Rule 1.8(a)(1) requires that the "transaction" be "fully disclosed," language that appears to refer to a narrower requirement than the "client consent [ ] after full disclosure" language of Rule 5–104(A) imposed (since, for example, Rule 1.8(a)(2) deals separately with advice of independent legal counsel).

To summarize, the siblings, who had the burden of proof, did not offer evidence that Smith failed to satisfy the requirements of Rule 1.8(a)(1)-(3), and I do not believe that we are entitled to assume that the requirements were not satisfied, either from the mere fact of Smith serving as both lawyer and (through her real estate company) broker, or from the fact that, in a non-disciplinary proceeding where her client was not the aggrieved party, Smith presented no evidence as to compliance with the Rule. I do not suggest that Smith's conduct was exemplary, and I would not foreclose a finding that she violated Rule 1.8(a) if a hearing committee were so to find (after notice to Smith of any rule she is alleged to have violated, and a hearing). But, on the record before us, I believe we should decline in this appeal to uphold the trial court's ruling that Smith violated Rule 1.8(a).[8]

I respectfully dissent.

---

**7.** And it is not hard to imagine that (and to understand why) a client who is trying to settle an estate whose major asset is a parcel of real property would, for the client's own benefit, desire and perhaps seek the services of a lawyer who could act as both lawyer and broker and eschew the expense and inconvenience of seeking other legal counsel to review a listing agreement.

**8.** This is both because, I believe, the ruling should not be *res judicata* as to Smith, and

because it may well disserve the legal community to find a violation of Rule 1.8(a) in the circumstances involved here on a record that was not fully developed in the trial court. *Cf. In re McLain,* 671 A.2d at 953 ("With respect to the charge of misrepresentation of the firm's name, we would not be able to reach a conclusion without a careful analysis, as this court has not previously ruled on whether the inclusion of an associate's name in a firm name violates our Rules of Professional Conduct. Under the particular circumstances present here, we will not undertake that analysis in this proceeding.... Because ... we do not have the benefit of adversary briefing and presentation, we deem it inappropriate to decide this issue of first impression.").